RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0025p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

WILLIAM A., a student, by and through his parents, E.A. and C.A.,

         *Plaintiff-Appellee*,

    *v*.

CLARKSVILLE-MONTGOMERY COUNTY SCHOOL SYSTEM,

         *Defendant-Appellant*.

No. 24-5591

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00912—Aleta Arthur Trauger, District Judge.

Decided and Filed: February 3, 2025

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** John D. Kitch, Rebecca Wells, Demaree, CORNELIUS & COLLINS, LLP, Nashville, Tennessee, for Appellant. Justin S. Gilbert, GILBERT LAW, PLC, Chattanooga, Tennessee, Jessica F. Salonus, THE SALONUS FIRM, PLC, Jackson, Tennessee, for Appellee.

---

**OPINION**

---

KETHLEDGE, Circuit Judge. William A. is dyslexic and graduated from high school with a 3.4 grade-point average. Yet even then he could not read. The school now challenges an order that it provide him with compensatory education under the Individuals with Disabilities Education Act. We affirm the order.

I.

A.

The Individuals with Disabilities Education Act (IDEA) offers federal money to states to help them educate children with disabilities. 20 U.S.C. § 1400. As a condition of accepting this money, states agree to provide disabled children with a "free appropriate public education"—one designed to meet each disabled child's unique needs. *Id.* §§ 1401(29), 1412(a)(1). For each child that the IDEA covers, a "team"—including teachers, school administrators, parents, and sometimes the child himself—collaborates to develop an individualized education plan (which the Act calls an "IEP"). *Id.* § 1414. The IEP tailors educational services to the child's "unique needs," and includes goals for the child's progress and a plan to achieve them. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982); 20 U.S.C. § 1414(d). At least once a year, the team meets to review the plan and make adjustments as needed. 20 U.S.C. § 1414(d). To encourage consensus, the IDEA provides for a "preliminary meeting" of team members and for mediation of disputes. *Id.* § 1415(f). But if those processes fail, parents may seek a "due-process hearing," over which an impartial adjudicator from a state or local educational agency presides. *Id.* After the adjudicator decides, the losing party may seek redress in state or federal court. *Id.* § 1415(i)(2).

B.

In 2016, William A. enrolled in the Clarksville-Montgomery County School System (which we refer to as "the school") as a fifth grader. Soon afterward, the school determined he had a learning disability that impaired his skills in reading, writing, and math. To address that disability, the school developed an individualized education plan for William. The plan included language therapy with a speech pathologist, as well as six hours per week of one-on-one instruction in reading, writing, and math. William also received several accommodations, such as additional time to take tests. Each year, the school and William's parents reviewed his IEP and made adjustments to it; but throughout middle school his educational plan remained largely the same. So did William's reading skills: in all three years of middle school, as to reading fluency, he tested below the tenth percentile, and he met none of his IEP's fluency goals.

When William reached high school, a special-education teacher expressed concern that his IEP was not helping him to make progress. The teacher emailed school administrators and said, "This kid can't read." William sometimes performed well in school anyway, earning As on some assessments, along with some Fs. But he made no progress toward his IEP's fluency goals. His IEP soon began to include additional accommodations, including the use of technology programs that read aloud printed text and helped him to write. Finally, in eleventh grade, a teacher suggested to William's mother that he might have dyslexia. His mother asked the school to evaluate him, and a school psychologist concluded that William indeed had dyslexia.

During the winter of his eleventh-grade year, William's parents arranged for him to receive private tutoring from a dyslexia specialist, Dr. Sarah McAfee. Unlike the instruction that William had received in school—which focused on reading fluency—McAfee's tutoring focused on more basic skills, like alphabetic sequencing and syllable recognition. Under her tutelage, William advanced to the second step of a twelve-step program designed to help dyslexic persons learn to read. That February, McAfee recommended that William continue this program as part of his IEP for the coming year. But the school rejected that idea, proposing instead that William continue with his existing plan. Although William's parents signed his IEP, they expressed concern (which the school recorded in the IEP) that William was not "receiving all of the supports he needs to be successful."

In March 2023, while William was still in eleventh grade, his parents filed an administrative complaint under the IDEA. Their main claim was that the school had denied William the "free and appropriate public education" to which the IDEA entitled him. They also raised claims under the Americans with Disabilities Act (ADA), the Rehabilitation Act, and 42 U.S.C. § 1983.

Three months later, an administrative law judge held a due-process hearing. Ten witnesses testified, among them three of William's teachers, three school administrators, and two special-education experts, including Dr. McAfee. One of William's expert witnesses—Kathryn Metcalf, a retired special-education administrator whom the ALJ deemed credible—testified that, at the foundation of a student's ability to read, lie basic skills like decoding and encoding—how letters make sounds, and how sounds make words. And until a student masters these basic skills,

Metcalf testified, he cannot develop the advanced skills (like fluency) that were the focus of William's IEPs. The school did not rebut any of that testimony. The ALJ also heard from Dr. McAfee, who testified that—through a program designed to help dyslexic persons learn to read—William had already made progress in developing these basic skills. The ALJ found Dr. McAfee credible also.

In the end, the ALJ reduced his inquiry to two questions: first, whether William could learn to read; and second, whether doing so required something different from what the school had offered William in his IEPs. "The answer to both questions," the ALJ found, "is a resounding yes." ALJ Decision, p. 38. The ALJ therefore held, in a 57-page opinion, that the school had violated William's right to a "free and appropriate public education" under the IDEA. As compensatory education, the ALJ ordered the school to provide William with 888 hours of dyslexia tutoring from a trained reading interventionist. The ALJ also held that the school had violated William's rights under the Americans with Disabilities Act and the Rehabilitation Act.

A month later, William's parents brought this action in federal court, seeking an order that the dyslexia tutoring come from Dr. McAfee specifically. The school, for its part, filed a counterclaim seeking reversal of the ALJ's order. Both parties moved for judgment on the administrative record. Based on that record—and applying a "modified de novo" standard of review, *see L.H. v. Hamilton County Dept. of Ed.*, 900 F.3d 779, 790 (6th Cir. 2018)—the district court made its own factual and legal determinations, while giving some deference to the ALJ's findings and expertise. The court reached the same conclusions the ALJ had: namely, that the school had violated William's rights under the IDEA, and that William was entitled to 888 hours of compensatory education to help him learn to read. Thus, the court itself ordered that same relief, but denied William's request that the dyslexia tutoring come from Dr. McAfee specifically. This appeal followed.

II.

A.

William argues that this appeal is nonjusticiable (on "standing" grounds, which is surely a misnomer here). Specifically, he contends that the school has challenged the district court's

order only to the extent it granted relief under the IDEA—and that the ADA and the Rehabilitation Act each provide an independent basis for that same relief. Thus, he says, we lack power to afford the school any relief in this appeal.

But William overlooks that an adverse judgment will often have collateral consequences such as a res-judicata effect or eligibility for attorney's fees. *See Mktg. Displays Int'l v. Shaw*, 93 F.4th 967, 971-72 (6th Cir. 2024). And in this case William has asked the district court to award him $266,967 in fees under the IDEA's attorney-fee provision. *See* 20 U.S.C. § 1415(i)(3)(B). That means the school retains an ample stake in the outcome of this appeal, regardless of whether his claims under another statute could sustain the award of injunctive relief.

B.

The school challenges the district court's determination that it failed to provide William with the "free appropriate public education" that the IDEA requires. We review the district court's factual findings for clear error and its legal conclusions de novo. *Knox County v. M.Q.*, 62 F.4th 978, 990 (6th Cir. 2023).

Under the IDEA, a participating school must provide "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). That means the school must offer an individualized education plan "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 399 (2017).

Here, as described above, the ALJ and the district court alike found that William's IEPs were not tailored to his circumstances—because those plans focused on fluency, while bypassing more foundational skills necessary for him to read. The school does not contest that point directly. Instead, it argues that—because William "was educated in the general classroom" and "maintained over a 3.0 grade point average . . . while advancing from grade to grade"—that William in fact received the "free and appropriate public education" to which he was entitled under the IDEA. But the Supreme Court has never held that "every handicapped child who is

advancing from grade to grade" necessarily receives the free and appropriate education mandated by the IDEA. *Endrew F.*, 580 U.S. at 402 n.2.

William did not receive that education here. Apart from his dyslexia itself, William's most salient "circumstance" for our purposes was that—with proper instruction—he can learn to read. *See L.H.*, 900 F.3d at 795-96. The school has not even tried to prove that finding wrong; yet William graduated from high school without being able to read or even to spell his own name. That was because, per the terms of his IEPs, he relied on a host of accommodations that masked his inability to read. To write a paper, for example—as the ALJ described—William would first dictate his topic into a document using speech-to-text software. He then would paste the written words into an AI software like ChatGPT. Next, the AI software would generate a paper on that topic, which William would paste back into his own document. Finally, William would run that paper through another software program like Grammarly, so that it reflected an appropriate writing style. Not all these workarounds were specifically listed in his IEP, but all were enabled by an accommodation that was: 24 extra hours to complete all assignments, which allowed William to complete his assignments at home, using whatever technology tools he could find.

Thus—unlike in math, where William's accommodations helped him learn the regular curriculum—William's workarounds in reading simply did the work for him. Yet the point of a "free and appropriate education" under the IDEA is not simply to complete assignments. The school is right to point out that the IDEA does not guarantee any particular outcome, such as learning to read. *Endrew F.*, 580 U.S. at 398. But when a child is capable of learning to read, and his IEP does not aim to help him overcome his particular obstacles to doing so, that IEP does not provide him the "free appropriate public education" to which he is entitled. *See id.* at 399. Such was the case here.

*   *   *

The district court's judgment is affirmed.